D. Maimon Kirschenbaum
Leah Seliger
JOSEPH KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 981-9587 (fax)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

| | |
|---|---|
| **MICHAEL STICKLER,** | CASE NO. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **IBM, INC.,** | |
| Defendant. | |

-----------------------------------------------------------x

Plaintiff Michael Stickler alleges as follows:

## JURISDICTION AND VENUE

1. This Court has diversity jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332, as Plaintiff is currently a resident of Illinois, Defendant is a resident of New York, and the value of Plaintiff's claims exceeds $75,000.

2. Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## THE PARTIES

3. Defendant IBM, Inc. is a New York corporation with offices worldwide, including offices in New York State ("IBM" or the "Company"). IBM is headquartered in Armonk, New York.

1

4. Plaintiff Michael Stickler ("Plaintiff Stickler" or "Plaintiff") was employed by Defendant IBM as a software engineer and then data scientist from August of 2013 until his retaliatory termination in December of 2021.

**FACTS**

5. Plaintiff Stickler joined IBM as a software engineer in the Company's Dublin, Ohio office in or about August of 2013.

6. In or about 2016, Plaintiff transferred to IBM's research headquarters in Yorktown Heights, New York.

7. In or about mid-2018, IBM changed Plaintiff's title to Data Scientist to more closely match the duties he had been performing since joining the Yorktown Heights office. A Data Scientist at IBM has a higher pay schedule than Software Engineer.

8. In his role as a Data Scientist, Plaintiff worked with the Company's team of researchers and analysts to develop and improve its various artificial intelligence properties and technologies.

9. Later in 2018, Plaintiff received a merit-based promotion for consistently exceeding expectations in his performance.

10. Throughout 2020 and 2021, Plaintiff and his team were analyzing a technology IBM created in an attempt to improve the accuracy of IBM's chatbot responses. Plaintiff, on his own, developed an algorithm that analyzed the efficacy of the feature being developed.

11. As a result of Plaintiff's team using Plaintiff's unique algorithm to evaluate the new chatbot feature, IBM was able to recognize that the feature was not functioning properly. This

realization prevented IBM from releasing a faulty product, incurring liability, and diminishing its brand value.

12. In January of 2021, Plaintiff received an award for Major Outstanding Innovation and Outstanding Technical Achievement. This IBM award requires that the employee's project earn the Company a minimum of $10 million. Only 0.1% of IBM employees worldwide received this recognition, and Plaintiff Stickler was the only employee on his team to receive the award.

13. Additionally, unlike most Software Engineers and Data Scientists at his Company level, Plaintiff had initiated seven patents for his work with IBM. In 2021, Plaintiff's most recent patent proposal was ranked a top priority for IBM to pursue among all other proposed patents within the Company.

14. In March of 2021, Plaintiff's fiance's 7-year-old son came to live with Plaintiff and his fiancé.

15. In advance of the boy's visit, Plaintiff asked his supervisor, Evelyn Duesterwald, if he could use a week of his earned vacation time to bond with his soon-to-be stepson. Plaintiff's manager denied his request to take vacation at that time.

16. In or about April of 2021, Plaintiff's fiancé became severely ill and required significant medical attention. She also could no longer care for her child.

17. Plaintiff, who was working remotely from home, found himself balancing his work, which provided for his fiancé and her son, with caring for his fiancé and her son. Further, because of the ongoing Covid 19 pandemic, Plaintiff's fiance's son was also unable to return to his school in person.

18. The burden of all these responsibilities began to impact Plaintiff's mental and physical health.

19. Plaintiff spoke to his Team Lead, who suggested that Plaintiff inform his manager, Ms. Duesterwald, about his personal situation so he could request time off under IBM's Personal Time Off program. The Personal Time Off program allows managers to grant their employees up to 10 days off with pay to address difficult personal matters.

20. Plaintiff's Team Lead told Plaintiff that a male employee had recently used the 10-day leave program to take time off following his divorce.

21. In late April of 2021, Plaintiff spoke to Ms. Duesterwald about his very trying personal situation and his need to take time off intermittently to care for his stepson and his ill fiancé.

22. Although Ms. Duesterwald could have offered him the full 10 days under the Personal Time Off program, she only offered him five days of leave to be used intermittently.

23. Plaintiff used the five days over the course of eight weeks, but in June of 2021, Plaintiff's fiancé was hospitalized.

24. As a result of the deterioration in Plaintiff's fiancé's health, Plaintiff once again needed intermittent time off to take her to doctors' appointments and to care for her child who was living with them.

25. In early July of 2021 Plaintiff asked his manager how he could take some time off to care for his fiancé.

26. Plaintiff's manager could have offered Plaintiff an additional five days under the Personal Time Off program. Ms. Duesterwald could have also offered him the ability to participate

in IBM's Emergency Paid Care Leave program, which provides up to 20 days of paid leave to care for child who is home for any Covid-related reason. Ms. Duesterwald could have also informed Plaintiff of his eligibility for New York's Paid Family Leave program.

27. However, Ms. Duesterwald did not offer Plaintiff paid time off under any of these programs, which are regularly offered to Defendant's female employees.

28. Instead, she told Plaintiff that he could take an unpaid leave of absence for six months to a year, with no guarantee that he would have a job at the end of the leave. Ms. Duesterwald also misinformed Plaintiff, telling him that he could take Family Medical Leave Act ("FMLA") leave, but would have to take the full 12 weeks of unpaid leave consecutively.

29. In response, Plaintiff Stickler complained that he was not being offered the same leave opportunities to care for his family as his female colleagues. In particular, Plaintiff pointed out that one of his female colleagues was given at least 20 days of paid intermittent leave to care for her child because her babysitter had quit. That same colleague was also permitted to work on a flexible schedule to accommodate her family's needs.

30. By contrast, Plaintiff's manager only offered him the option of working part-time for part-time pay or taking an unpaid leave of absence.

31. Neither of the options offered by Ms. Duesterwald would work for Plaintiff, so he continued to work full-time while also balancing his responsibilities to his ailing fiancé and her young son.

32. One week following Plaintiff's complaint that he did not have equal access to the Company's various leave programs, Ms. Duesterwald put him on a performance improvement plan

("PIP"). Pursuant to the PIP, Plaintiff had eight weeks to deliver and present a report about the algorithm utilized by one of the Company's computer program products.

33. After the conclusion of the eight-week PIP, Ms. Duesterwald told Plaintiff that he had satisfied the requirements of the PIP but that she would continue to meet with him on a weekly basis.

34. Following Plaintiff's successful performance of his PIP requirements, Defendant assigned Plaintiff to a new project.

35. Although Plaintiff's performance on the new project was satisfactory, on December 15, 2021, Defendants terminated Plaintiff's employment in direct retaliation for his requests for leave and in retaliation for complaining about the unequal access he, as a male employee, had to IBM's leave policies.

36. Plaintiff has suffered, and continues to suffer, significant emotional distress and financial loss as a direct result of Defendant's discriminatory and retaliatory actions.

**FIRST CLAIM FOR RELIEF**
**New York State Human Rights Law ("NYSHRL") – N.Y. Exec. Law §§ 290 *et seq.***
**Gender Discrimination**

37. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

38. In violation of NYSHRL, Defendant intentionally discriminated against Plaintiff on the basis of his gender.

39. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

40. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

41. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment; punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### NYSHRL – N.Y. Exec. Law §§ 290 *et seq.* – Retaliation

42. Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

43. In violation of the NYSHRL, Defendants retaliated against Plaintiff for complaining about discrimination.

44. Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

45. As a direct and proximate consequence of Defendant's retaliation against Plaintiff, he has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation, and anguish.

46. As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages and damages for emotional distress, physical injuries, and medical treatment; punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

    (A)    For compensatory, liquidated and punitive damages in an amount to be determined by the trier of fact;

    (B)    For reasonable attorneys' fees, interest, and costs of suit;

    (C)    For such other and further relief as the Court may deem just and equitable.

Dated: New York, New York
        March 25, 2022

Respectfully submitted,
JOSEPH & KIRSCHENBAUM LLP

By: */s/ D. Maimon Kirschenbaum*
     D. Maimon Kirschenbaum
     Leah Seliger
     32 Broadway, Suite 601
     New York, NY 10004
     Tel: (212) 688-5640
     Fax: (212) 981-9587

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which he has a right to jury trial.